UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

GLOVER CONSTRUCTION CO., INC.
d/b/a GLOVER CONSTRUCTION
CORPORATION OF NORTH CAROLINA,
a North Carolina corporation

     Plaintiff,

vs.                                                              CASE NO. 3:21-cv-802

THE CITY OF JACKSONVILLE, a municipal
corporation in Duval County, Florida and
THE CHEMOURS COMPANY TT, LLC,
A Delaware Limited Liability Company

     Defendants.

_____/

## COMPLAINT

Plaintiff, GLOVER CONSTRUCTION CO., INC., by its undersigned attorneys sues Defendants, THE CITY OF JACKSONVILLE and THE CHEMOURS COMPANY TT, LLC, as follows:

## The Parties

1. GLOVER CONSTRUCTION CO., INC. d/b/a GLOVER CONSTRUCTION CORPORATION OF NORTH CAROLINA (Plaintiff or Glover) is a North Carolina corporation with its principal place of business located in Pleasant Hill, North Carolina.

2. Defendant, THE CITY OF JACKSONVILLE ("City" or "COJ") is a municipal corporation located in Duval County, Florida.

3. Defendant, THE CHEMOURS COMPANY FC, LLC ("Chemours"), the successor by merger to The Chemours Company TT, LLC, is a Delaware Limited Liability Company with its principal place of business in Wilmington, Delaware.

## The Trail Ridge Landfill Expansion Project

4. At all times material hereto, COJ was the owner of the Trail Ridge Landfill located at 5110 U.S. Highway 301 South, Duval County, Florida.

5. At a date unknown to Glover, COJ contracted with CDM SMITH INC. (CDM), a Massachusetts corporation with its principal place of business in Boston, Massachusetts, to provide design and other professional engineering services required to expand the Trail Ridge Landfill by construction of Phases 6-8, Class 1 Cell Expansion (the "Project").

6. At all times material hereto, CDM was registered and authorized to provide professional engineering services in the state of Florida, FL COA No. EB-0000020

7. At all times material hereto, ENGLAND-THIMS & MILLER, INC. (ETM) (not a party), was registered and authorized to provide professional engineering services in the state of Florida, FL COA No. 2584.

8. At a date unknown to Glover, COJ contracted with ETM to provide professional engineering services for use in permitting the Project.

9. In February 2013, CDM issued a Regional Surface Water Model Final Report to COJ for use in permitting the Project.

10. In February 2013, ETM issued Trail Ridge Landfill Phase 6-8 Drainage Calculations to COJ for use in permitting the Project.

2

11. In April 2013, based on "Hydrologic and Hydraulic Modeling" performed by CDM, ETM prepared design drawings, including design of a Stormwater Management System[1], for use in permitting the Project (the "Permit Plans"). The Permit Plans were only 30% complete and not for use in construction of the Project.

12. CDM's "Hydrologic and Hydraulic Modeling" relied upon by ETM in preparing the Permit Plans identified peak overland water flow onto and across the Project site which was used to determine the size of the Stormwater Management System.

13. The CDM Regional Surface Water Model Final Report, and the Drainage Calculations and Permit Plans prepared by ETM (collectively, the "Permit Documents") were provided to the Florida Department of Environmental Protection (FDEP) to obtain a permit authorizing construction of the Project.

14. The Permit Plans at Sheet 12 specified the construction of inlet flumes at wetlands on the west boundary of the Project (the "Wetlands Inlet Flumes"). The Wetlands Inlet Flumes sloped from the existing grade at the western Project boundary to the bottom of the Interceptor Ditch in order to control the flow of stormwater from adjacent property west of the Project site into the Interceptor Ditch. The design intent was to protect the Interceptor Ditch from overland stormwater flow and to facilitate the natural drainage patterns of offsite water

---

[1] The Stormwater Management System design provided in the Permit Plans included Wetlands Inlet Flumes, Interceptor Ditch, Perimeter Ditch and Interior Diversion Ditches (collectively the "Stormwater Management System") which were intended to be interdependent and function together to manage the flow of stormwater onto, across and off the Project site.

across the Project. The Permit Plans called for the Wetlands Inlet Flumes to be reinforced with a "Fabriform" material to prevent the energy of offsite water flow from undermining the Interceptor Ditch.

15. In December 2013, the FDEP issued Permit No. 16-307659-002-EI (the "Permit") authorizing construction of the Project in accordance with the terms, conditions and attachments contained in the Permit and Permit Documents including, *inter alia*, the Permit Plans.

16. After the Permit was issued, CDM prepared final construction drawings for use in soliciting bids and construction of the Project (the "Construction Drawings").

17. In preparing the Construction Drawings, CDM relied upon its Hydrologic and Hydraulic Modeling which it failed to update to identify the increased stormwater flow onto the Project site that it should have expected to occur because an adjacent landowner had cleared the upland forest adjacent to the wetlands at inlet flumes "F" and "G."

18. The Construction Drawings revised the design of the Wetlands Inlet Flumes intended to protect the Interceptor Ditch from that shown in the Permit Plans. A less robust permeable plastic fiber mat was substituted for the originally specified non-permeable "Fabriform." The slope of the Wetlands Inlet Flume was revised to terminate below the top edge of the Interceptor Ditch, rather than at the bottom of the ditch. The revised design allowed offsite stormwater to permeate through the

fiber mat and flow under the top edge of the concrete ditch panel, undermining the Interceptor Ditch.

19. COJ issued BID No. CP-007-15, including, *inter alia*, an Invitation to Bid, Instructions to Bidders, a contract form, General Conditions, Specifications and the Construction Drawings, to solicit competitive bids from qualified contractors for construction of the Project (the "Solicitation").

20. Glover responded to the Solicitation and was the successful low bidder. In May 2015, COJ awarded a contract to Glover for construction of the Project in accordance with the Construction Drawings prepared by CDM (the "Construction Contract"). A true and correct copy of the Construction Contract is attached as **Exhibit A**.

21. COJ amended its contract with CDM by change orders which required that CDM provide professional services for contract administration and supervision of Glover's construction of the Project.

### Glover's Damaged Work

22. In September 2016 Hurricane Hermine impacted the Project site and surrounding lands. Offsite stormwater known to historically flow from the west across the Project site undermined the west Interceptor Ditch causing the concrete ditch panels to crack and heave and flowed across the Project site causing extensive damage to Glover's work, including, *inter alia*, the north Interceptor Ditch and related storm water improvements.

23. At the time Hurricane Hermine impacted the Project, Glover had substantially completed work on the Interceptor Ditch, thus, it should have functioned as intended.

24. On September 12, 2016, Glover submitted Change Order Request Number 3 (COR No. 3) to COJ requesting additional compensation for the cost to restore its work to the previous level of completion following Hurricane Hermine.

25. On September 16, 2016, CDM, on behalf of COJ, denied Glover's COR No. 3 referencing the Construction Contract which authorized an extension of the Contract Time for delays caused by acts of God and extreme weather, including Hurricanes, but noting that the Contractor was not entitled to additional compensation for excusable delays and had assumed responsibility for all risk of damage and destruction to its completed work in progress until the work was fully completed and accepted by COJ. CDM also acknowledged that Glover may request a time extension for the time required to restore the damaged work to its previous level of completion, and an increase in the Contract Amount for costs associated with emergency actions taken to protect the work prior to the Hurricane. [2]

26. In October 2016, Hurricane Matthew impacted the Project site and surrounding lands causing additional damage to Glover's work, similar to the damage which resulted from Hurricane Hermine.

---

[2] In its letter denying Glover's COR No. 3 CDM cited the Construction Contract, General Condition §§ 20.6.3, 20.8.1, 20.8.4, 20.8.5, 20.32.1, 20.32.3, 20.32.4 & 20.32.5. Note: The General Conditions do not appear to include § 20.8.5.

27. After Hurricane Matthew impacted the Project, Glover resubmitted COR No. 3 to COJ urging that significant damage to completed, fully stabilized work was the result of COJ's sequencing of work related to storm water control. Prior to Hurricanes Hermine and Matthew, Glover had performed significant sequence three work at its own expense to establish better site drainage and to capture storm water runoff. Glover again requested compensation for the cost to repair its damaged work as required to return it to the previous level of completion.

28. By letter dated December 15, 2016, CDM, on behalf of COJ, again denied Glover's COR #3 explaining that Glover was responsible for protecting its completed work from damage, that COJ's sequencing of the work did not excuse Glover from "... provide[ing] proper facilities and take[ing] all precautions to assume the entire cost for protecting the work from weather conditions and for handling all storm, flood, ground water.... that may be encountered during the performance of the contract," and that the Construction Contract placed the risk of natural disaster on Glover until the work has been completed and accepted by COJ.[3] COJ and CDM also contended that stabilization measures such as "grassing" and "vegetation" should have been installed.

29. Prior to Hurricanes Hermine and Matthew, Glover spent five (5) days to prepare the site for the approaching storms which included, *inter alia*, the construction of three berms, matting the slopes of the ditch, and digging a new ditch.

---

[3] CDM cited the Construction Contract, General Conditions §§ 20.32.3 and 20.32.4.

30. Subsequent to CDM/COJ's rejection of COR No. 3, Glover directed its Jacksonville Small Emerging Business (JSEB) subcontractor responsible for construction of the concrete ditches, Onas Corporation (Onas), to repair the damaged concrete ditches and perform other recovery efforts within its scope of work, consistent with CDM/COJ's direction to Glover.

31. Onas contended that the damage to its completed work during Hurricane Hermine was caused by design issues and that no protective measures could have prevented the damage to the completed work.  Onas declined to perform the repairs but continued to perform other aspects of its base work other than the repairs.  By March 15, 2017 Onas had stopped all work.

32. On March 3, 2017 Glover requested COJ's authorization to replace Onas with a non-JSEB subcontractor as by this time Glover had satisfied its contractual JSEB utilization goal.  However, COJ did not authorize Glover to terminate and replace Onas until May 18, 2017, upon which Glover contracted with Morris Carter Concrete, who mobilized to perform the concrete ditch repair work on May 31, 2017.  COJ's refusal to allow Glover to terminate Onas and retain a substitute subcontractor to perform the repair work actively interfered with and delayed the Project completion from March 16 to May 18, 2017.

33. The Project site and surrounding lands were impacted by Hurricane Irma in September 2017. Offsite stormwater from adjacent property west of the Project site flowed onto and across the Project site and undermined the Wetlands Inlet

Flumes and the Interceptor Ditch, and flowed across the Project site causing significant destruction and damage to Glover's work.

34. In advance of Hurricane Irma, Glover spent four (4) days, September 6-9 2017, to prepare and protect the site and completed work from the approaching storm by, *inter alia*, building additional berms to protect the work from the stormwater flow. Unfortunately, these efforts proved unsuccessful as Hurricane Irma caused significant damage to the completed work at the Project similar to that experienced during Hurricanes Hermine and Matthew.

## CDM Revised Its Design to Control Stormwater and Prevent Future Drainage

35. Subsequent to Hurricane Irma, CDM revised the design of the Wetlands Inlet Flumes, Interceptor Ditch  and the Pond B Flume in order to withstand and control the flow of stormwater onto and across the Project site. These design changes included, but were not limited to, *inter alia*:

(a) The Wetlands Inlet Flumes between the Interceptor Ditch and the west Project boundary were constructed of concrete, rather than permeable plastic fiber mat;

(b) The perimeter edges of the new concrete Wetlands Inlet Flumes were armored with rip rap to prevent undermining of the Wetlands Inlet Flumes and Interceptor Ditch;

(c) The Wetlands Inlet Flumes were extended to the bottom of the Interceptor Ditch rather than terminating under the top edge of the Interceptor Ditch;

(d) A drop inlet was added to address offsite overland stormwater flow from the west between stations 157 and 158 (the "logging road"), a source of concentrated stormwater flow which undermined the west Interceptor Ditch during Hurricane Irma;

(e) The flume at Pond B was redesigned to require 5" thick concrete ditch panels, additional reinforcement, an underdrain system with weep holes and a 12" thick layer of #57 stone with filter fabric.

36. The means and methods required for construction of the Interceptor Ditch made it impossible to install the fiber mat at the Wetlands Inlet Flumes until the construction of the Interceptor Ditch had been completed; otherwise, prematurely installed fiber mat would be destroyed during construction of the Interceptor Ditch, and ineffective. Likewise, specified stabilization measures such as "grassing" and "vegetation" were not adequate to protect the Wetlands Inlet Flumes and Interceptor Ditch from the offsite stormwater. Also, like the fiber mat, the "grassing" and "vegetation" could not be installed until construction of the Interceptor Ditch had been completed. CDM's design changes resolved these flaws.

37. Glover substantially completed the work on April 27, 2019.

38. COJ recognized substantial completion and accepted the work on August 19, 2019.

39. On December 9, 2019, Glover provided COJ with a Notice of Claim.

## Count I – Breach of Contract (COJ)

40. This is an action for breach of contract against Defendant, THE CITY OF JACKSONVILLE, with damages in excess of $75,000 exclusive of prejudgment interest and costs.

41. Plaintiff realleges paragraphs 1, 2 and 4-39, above.

42. On or about November 19, 2015, Glover and COJ agreed to Change Order No. 1, which amended the Construction Contract, adding $251,179 to the Contract Amount, revised the Completion Date for Sequence One to February 24, 2016 and added an additional eight (8) days to the Contract Time as a result of excessive rain in August 2015.

43. On or about September 27, 2016, COJ and Glover agreed to Change Order No. 2, which amended the Construction Contract adding $756,371 to the Contract Amount, revised the construction Completion Date for Sequence One to March 2, 2016 and for Phase 6 to March 9, 2016, and added seven (7) days to the Contract Time for Sequence One due to excessive rain in November 2015, February 2016, and April 2016.  Although Change Order No. 2 added new work it did not include any agreement for additional time to complete the new work which COJ and Glover agreed would be determined at a future date by the following handwritten addendum:

> In addition to the seven rain days added to the construction completion date, there is also additional time involved in performing specific items on this Change Order which will extend the cell completion date beyond March 2, 2016. All parties have agreed to address this at a later date if required. Currently, existing landfill operation has not been impacted. If completion of the new cell is

performed prior to the detrimental impact to the current landfill operation, a determination of the additional time will not be required as long as liquidated damages are not assessed.

44. On or about January 30, 2018, COJ and Glover agreed to Change Order No. 3 which amended the Construction Contract adding $42,242 to the Contract Amount and revised the construction Completion Date for Sequence Three to July 2, 2017.

45. The approved Contract Amount through Change Order No. 3 was $29,283,582, of which $4,987.50 has not been invoiced pending approval of outstanding Change Order Requests[4] and remains unpaid.

46. COJ owed Glover a duty to provide Glover with Construction Drawings for use in construction of the Project that were constructible, and which complied with the applicable engineering standard of care as required to control overland stormwater flow onto and across the Project site and prevent damage to Glover's work.

47. COJ breached the Construction Contract and its duty to Glover in that the Construction Drawings provided by COJ for use in the construction of the Project did not meet the engineering standard of care and included the following errors and omissions:

(a) In preparation of the Construction Drawings, CDM did not update its Hydrologic and Hydraulic Modeling to identify the offsite flow rate after an adjacent landowner had cleared the upland forest adjacent to the wetlands

---

[4] See paragraph 51 – COR Nos. 4, 5 and 6.

12

at inlet flumes "F" and G," which had the effect of increasing the rate of offsite stormwater flow onto the Project site;

(b) Error to change the permitted Wetlands Inlet Flume design which required use of non-permeable "Fabriform" material for construction of the inlet flumes and termination of the flumes at the bottom of the Interceptor Ditch to a less robust design utilizing a permeable fibermat in lieu of "Fabriform" and terminating the flumes below the top edge of the Interceptor Ditch. The permitted design would have functioned properly and prevented the damage that occurred in the area of the Wetlands Inlet Flumes due to CDM's changes to the Permit design in the Construction Documents;

(c) Omission to design the Wetlands Inlet Flumes in such a way that they could not handle the energy of concentrated stormwater flow, leading to undermining of the fibermat and Interceptor Ditch;

(d) Error to design the turndown edges of the Interceptor Ditch in such a way that installing the fibermat under the top edge of the Interceptor Ditch was impossible due to means and methods required to construct the Interceptor Ditch that would have destroyed any installed fibermat;

(e) Error to require that additional fibermat be installed at undermined locations along the Interceptor Ditch, because the detail was impossible to build and was defective in that the elevation of the fibermat was below the top edge of the Interceptor Ditch, which diverted runoff under the concrete ditch panels. This increased ground water pressure under the Interceptor

13

Ditch and lifted up, displaced and broke the concrete ditch panels, requiring that the panels be replaced;

(f) Error to design permeable fibermat Wetlands Inlet Flumes below the top edge of the Interceptor Ditch, creating a dam and diverting stormwater flow under the concrete ditch panels. The energy of the diverted stormwater flow lifted up, displaced and broke the panels requiring that the panels be replaced;

(g) Error to design the concrete ditch panels at the Pond B Flume in a manner that did not resist water pressure of the surrounding soil. The concrete ditch panels were not sufficient to resist the water pressure and cracked requiring replacement;

(h) Error in the design sequencing (i.e., failure to coordinate the construction of Interior Diversion Ditches, the Perimeter Ditch and other stormwater diversion structures with the construction of the Interceptor Ditches). The Interceptor Ditch was not designed to control stormwater flow from the interior of the site and uncontrolled stormwater flowed across the Project site undermining the Interceptor Ditch from the inside resulting in significant damage to Glover's work;

(i) Omission by failure to provide for control of overland stormwater flow down the logging road between stations 157 and 158, a source of concentrated flow which undermined the Interceptor Ditch. The design should have provided

14

for control of the concentrated offsite stormwater to prevent damage to the Interceptor Ditch;

(j) Error in failing to act on patent design defects once the defects were brought to CDM's attention. Glover and its subcontractor (Onas) identified problems with controlling overland stormwater flow, but CDM did nothing to respond to those concerns until it redesigned the Wetlands Inlet Flumes and Pond B Flume after Hurricane Irma. CDM's failure to timely respond caused or contributed to the site being exposed to uncontrolled overland stormwater flow which damaged the concrete ditch panels, which then needed to be replaced.

48. As a result of the foregoing errors and omissions, CDM's Project design, as depicted in the Construction Drawings provided by COJ, was not constructible nor adequate to protect the completed work from damage due to the anticipated offsite overland stormwater flow and did not facilitate drainage of offsite water across the Project.

49. Glover suffered substantial damage as a result of the design errors and omissions in the Construction Drawings provided by COJ. The uncontrolled offsite stormwater undermined and damaged Glover's completed Stormwater Management System work. Glover incurred substantial additional costs to repair and replace its damaged work, and completion of the Project was significantly delayed resulting in additional unanticipated overhead expense as a result of the defective design.

50. In June and July of 2018, CDM issued a revised design for use in repairing the damaged work and completion of the Project.

51. On March 30, 2020, Glover submitted Change Order Requests Nos. 4, 5 and 6 (COR Nos. 4, 5 and 6):

(a) COR No. 4 requested an extension of 367 days to the Contract Time and additional compensation in the amount of $74,269.78. The time extension related to delays caused by Hurricanes Hermine, Matthew and Irma, the time required to restore the work to its previous level of completion after each storm, and the time required for Glover to prepare for the storms. The additional compensation requested related to new work performed in advance of each of the storms to prevent damage to the work;

(b) COR No. 5 requested a 105 day extension of the Contract Time and additional compensation in the amount of $247,635.92 as a result of additional work added to Project by field orders, designer clarifications and written directives issued by CDM on behalf of COJ, as authorized by the Construction Contract;

(c) COR No. 6 requested a 268 day extension of the Contract Time for delays suffered as a result of COJ's active interference by its failure to allow Glover to terminate Onas when Onas refused to perform work necessary to repair the damage caused by Hurricanes Hermine and Matthew and to complete its scope of work.

16

COR Nos. 4, 5, and 6 cumulatively seek a 740 day extension of the Contract Time to July 12, 2019 and additional compensation of $321,905.70, increasing the Contract Amount to $29,605,487.70.

52. On June 20, 2020, Glover submitted its Claim For Equitable Adjustment of the Contract Amount for the costs incurred to repair damaged work necessary to recover the state of completion attained prior to Hurricanes Hermine, Mathew and Irma, as a consequence of the defective design provide by COJ.

53. COJ breached the Construction Contract by its failure to approve or otherwise take any action on Glover's COR Nos. 4, 5, or 6 and its Claim For Equitable Adjustment of the Contract Amount.

54. On March 30, 2020, Glover delivered its Pay Application No. 47 to COJ and CDM in the amount of $1,325,346.17.  By email sent April 16, 2020, CDM provided Glover's Pay Application No. 47 to COJ and advised that the Pay Application was "... complete and correct."  Under Florida law, COJ was required to pay Glover's Pay Application No. 47 by May 21, 2020, 25 business days after COJ received the approved invoice from CDM on April 16, 2020, unless COJ timely rejected the Pay Application in writing, specifying the deficiency and corrective action required. [5]

55. COJ did not timely reject Glover's Pay Application No. 47 and payment was not made until September 21, 2020, four (4) months late.  COJ is indebted to

---

[5] See F.S. §§218.735(1)(a), 218.735(2), 218.735(9), 218.74(1)

Glover for interest on Pay Application No. 47 in the amount of $53,013.84 ($1,325,346.17 x 1% = 13,253.46 x 4 months, May 21- September 21, 2020). [6]

56. On August 19, 2021 COJ waived §20.49.11 of the Construction Contract requiring that all claims between Glover and COJ be submitted to the City Construction Dispute Review Board as a condition precedent to bringing any action in a court of competent jurisdiction.  All other conditions precedent to this action have been performed or occurred.

WHEREFORE, Plaintiff, GLOVER CONSTRUCTION CO., INC., demands judgment for damages against Defendant, THE CITY OF JACKSONVILLE, together with an award of prejudgment interest, costs and such other and further relief as the Court may deem meet and proper.

### Count II – Breach of Implied Covenants (COJ)

57. This is an action for breach of implied covenants and conditions of a written contract against Defendant, THE CITY OF JACKSONVILLE, with damages in excess of $75,000, exclusive of prejudgment interest and costs.

58. Plaintiff realleges paragraphs 1, 2, 4-39, 42-52, 54 and 55 above.

59. By entering into the Construction Contract with Glover COJ agreed to implied covenants and conditions within the scope of the Construction Contact including, *inter alia*:

(a) An implied covenant that it would perform its obligations under the Construction Contract in good faith;

---

[6] See F.S. §218.735(9).

18

(b) An implied obligation not to do anything to hinder or obstruct Glover's performance of its obligations required by the Construction Contract;

(c) An implied obligation not to knowingly delay unreasonably Glover's performance of duties assumed under the Construction Contract; and

(d) An implied obligation to furnish information which would not mislead prospective bidders, such as Glover.

60. COJ breached the implied covenants and obligations contained with the Construction Contract as follows:

(a) COJ provided defective Construction Drawings that did not meet the engineering standard of care and were not adequate for construction of the Project. Glover was misled by the CDM Construction Drawings provided by COJ as it reasonably believed that work performed in compliance with the Construction Drawings would be adequate for its intended purpose of managing stormwater historically expected to flow onto, across and off the Project site, without damage to completed work;

(b) COJ hindered, obstructed and unreasonably delayed Glover's performance of its contractual obligations by its refusal to allow Glover to timely terminate its JSEB concrete subcontractor, Onas, when Onas refused and failed to repair and complete its damaged work as directed by CDM on behalf of COJ

(c) COJ breached its covenant of good faith and fair dealing in performance of its obligations under the Construction Contract by its failure to:

19

(i) timely recognize substantial completion and accept the work;

(ii) timely pay Glover's Application for Payment No. 47;

(iii) timely review and approve or take action on Glover's COR Nos. 4, 5 and 6; and

(iv) timely authorize Change Orders to equitably adjust the Contract Amount for increased costs incurred to repair and complete the work, including the cost to comply with revised design directives, once the errors and omissions in CDM's Construction Drawings were known, recognized and discovered.

61. Glover has been damaged by COJ's breach of the implied covenants and conditions within the scope of the Construction Contract.

62. On August 19, 2021 COJ waived §20.49.11 of the Construction Contract requiring that all claims between Glover and COJ be submitted to the City Construction Dispute Review Board as a condition precedent to bringing any action in a court of competent jurisdiction. All other conditions precedent to this action have been performed or occurred.

WHEREFORE, Plaintiff, GLOVER CONSTRUCTION CO., INC., demands judgment for damages against Defendant, THE CITY OF JACKSONVILLE, together with an award of prejudgment interest, costs and such other and further relief as the Court may deem meet and proper.

## Count III– (Chemours)

63. This is an action against the Chemours Company, FC, LLC with damages in excess of $75,000 exclusive of prejudgment interest and costs.

64. Plaintiff realleges paragraphs 1, 3-16, 19, 20 and 33 above.

65. At all times material hereto, Chemours owned the upland property directly adjacent to and west of the Project site on which it has conducted mining operations.

66. The natural flow of surface water from the Chemours' property was east and north onto the Project site.

67. In furtherance of its mining operations on its property adjacent to the Project Site Chemours constructed a storm water management system including storm water treatment polishing and discharge ponds in which Chemours accumulated and stored large quantities of water.

68. In September of 2017, contemporaneous with Hurricane Irma, the storm water treatment ponds maintained by Chemours identified as D-011, as shown on the map attached as **Exhibit B**, discharged large quantities of water which flowed east and north across the Chemours property and onto the Project site causing significant damage to the Interceptor Ditch and other work performed by Glover.

69. Chemours' use and operation of the storm management system and storm water treatment ponds on its property was unreasonable where it resulted in the discharge of a large quantity of water from ponds D-011 which flowed onto the

Project site causing extensive damage to the Interceptor Ditch and other work performed by Glover.

70. Glover has been damaged by Chemours' unreasonable conduct in the use and operation of the storm water management system and storm water treatment ponds D-011, including, *inter alia*, the cost to repair and reconstruct its damaged work, labor inefficiencies, delays, extended and unanticipated overhead and general conditions costs.

WHEREFORE, Plaintiff, GLOVER CONSTRUCTION CO., INC., demands judgment for damages against Defendant, CHEMOURS COMPANY, FC, LLC, together with an award of prejudgment interest, costs and such other and further relief as the Court may deem meet and proper.

Dated this 19th day of August 2021.

AG ADAMS LAW, P.A.

Adam G. Adams, III
Florida Bar No. 370738
1522 Oak Street
Jacksonville, FL 32204
Telephone (904) 256-4112
service@agadamslaw.com
lep@agadamslaw.com
janell@agadamslaw.com

and

Vandeventer Black LLP
Anthony J. Mazzeo
Florida Bar No. 0114650

101 W. Main St.,
500 World Trade Center
Norfolk, VA  23510
amazzeo@vanblacklaw.com
*Attorneys for Plaintiff Glover Construction Co., Inc. d/b/a Glover Construction Corporation of North Carolina*